UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

JOHN BAYLES,

                   Plaintiffs,

       vs.

CARBON BLACK INC., PATRICK
MORLEY, JEFFREY FAGNAN, RONALD
NORDIN, VANESSA PEGUEROS, JOSEPH
TIBBETTS, JR., JILL WARD, TOM
KILLALEA, and ANTHONY ZINGALE,

            Defendants.

------------------------------------ X

Case No.:

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, John Bayles ("Plaintiff"), by and through his attorneys, allege the following

upon information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon

personal knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Carbon Black, Inc. ("Carbon Black"

or the "Company") and the members of the Company's board of directors (collectively referred to

as the "Board" or the "Individual Defendants" and, together with Carbon Black, the "Defendants")

for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States

Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9").

Plaintiffs' claims arise in connection with the proposed tender offer ("Tender Offer") by VMware,

Inc. ("Parent") through its subsidiary Calistoga Merger Corp. ("Purchaser," and collectively with

Parent, "VMware"), to acquire all of the issued and outstanding shares of Carbon Black (the "Proposed Transaction").

2.      On August 22, 2019, Carbon Black entered into an agreement and plan of merger, (the "Merger Agreement"), whereby shareholders of Carbon Black common stock will receive $26.00 in cash for each share of Carbon Black stock they own (the "Offer Price").

3.      On September 6, 2019, in order to convince Carbon Black shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"). In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the sales process; (ii) the fairness opinion and financial analyses performed by the financial advisor to the Company's special committee, Morgan Stanley & Co. LLC ("Morgan Stanley"); and (iii) certain financial projections prepared by Carbon Black and relied upon by Morgan Stanley.

4.      The Tender Offer is scheduled to expire at midnight, New York City time, at the end of the day on Thursday, October 3, 2019 (the "Expiration Date"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed determination on whether to tender their shares.

5.      For these reasons, and as set forth in detail herein, Plaintiffs seek to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Carbon Black's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff alleges violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

8.     Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Carbon Black's common stock trades on the Nasdaq Global Select Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Carbon Black's common stock.

10.    Defendant Carbon Black is a Delaware corporation and maintains its principal executive office at 1100 Winter Street, Waltham, Massachusetts 02451.  Carbon Black performs cloud endpoint protection services, enabling its customers to predict, prevent, detect, respond to, and remediate cyber attacks before they cause a damaging incident or data breach.  The Company's common stock trades on the Nasdaq under the ticker symbol "CBLK".

11.    Defendant Patrick Morley ("Morley") is, and has been at all relevant times, the President and Chief Executive Officer and a director of the Company.

12.    Defendant Jeffrey Fagnan ("Fagnan") is, and has been at all relevant times, a director of the Company.

13.    Defendant Ronald Nordin ("Nordin") is, and has been at all relevant times, a director of the Company.

14.    Defendant Vanessa Pegueros ("Pegueros")  is, and has been at all relevant times, a director of the Company.

15.    Defendant Joseph Tibbetts, Jr. ("Tibbetts") is, and has been at all relevant times, a director of the Company.

16.    Defendant Jill Ward ("Ward") is, and has been at all relevant times, a director of the Company.

17.    Defendant Tom Killalea ("Killalea") is, and has been at all relevant times, a director of the Company.

18.    Defendant Anthony Zingale ("Zingale") is, and has been at all relevant times, a director of the Company.

19.    The defendants identified in paragraphs 11-18 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A. Background and the Unfair Offer Consideration

20.     Carbon Black is a cybersecurity company based in Waltham, Massachusetts that develops could-native endpoint security software designed to detect malicious behavior and help prevent malicious files from attacking an organization.

21.     The Company was founded in 2002 as Bit9.  In 2014, Bit9 acquired start-up security firm Carbon Black and the Company changed its name to Carbon Black in early 2016.

22.     On May 8, 2018, Carbon Black closed its initial public offering, in which it issued and sold 9.2 million shares of common stock at $19.00 per share, raising approximately $152 million based on a Company valuation of $1.25 billion.

23.     Since going public, the Company has been extraordinarily successful.  For example, on August 1, 2019 – just a few weeks before the Company announced that it was being acquired by VMware – the Company issued a press release entitled *Carbon Black Announces Second Quarter 2019 Financial Results*, which stated in part:

> "Carbon Black's second quarter results demonstrated the company's successful transition to a cloud first company powered by our leading, cloud-native endpoint protection platform (EPP), the Predictive Security Cloud® (PSC)," said Patrick Morley, President and Chief Executive Officer of Carbon Black.  "We reached an important milestone in the quarter with cloud ARR exceeding $100 million, which reflects growing customer demand for a cloud EPP solution that can successfully protect against today's increasingly sophisticated cyberattacks."
>
> Morley continued, "Our cloud EPP, which includes highly differentiated products like CB ThreatHunter and CB LiveOps$^{TM}$, is extending the boundaries of the EPP market.  Customer reaction to our expanded product portfolio remains very positive and gives us confidence Carbon Black can drive strong cloud growth for the foreseeable future.

24.     Therefore, the Proposed Transaction comes at a time when the Company's recent and future success was not fully reflected by its share price.  The Proposed Transaction

will cash-out Carbon Black's stockholders at a price that fails to adequately compensate them for the intrinsic value of their shares and provides unique benefits to the Individual Defendants, including Defendant Morley, who is cashing out substantial amounts of otherwise illiquid stock and unvested stock options notwithstanding his continued employment in the combined company.

25.     Despite Carbon Black's intrinsic value and exceptional growth prospects, the Individual Defendants are agreeing to sell the Company and deprive its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which has caused Plaintiffs and the Class to receive an inadequate Offer Consideration.

**B.      The Proposed Transaction**

26.     On August 22, 2019, Carbon Black and VMware jointly announced the Proposed Transaction.  The press release stated as follows:

> **PALO ALTO, Calif., August 22, 2019 –** VMware, Inc. (NYSE: VMW), a leading innovator in enterprise software, and Carbon Black (NASDAQ: CBLK), a leader in cloud-native endpoint protection, today announced that the companies have entered into a definitive agreement by which VMware will acquire Carbon Black in an all cash transaction for $26 per share, representing an enterprise value of $2.1 billion. Following the close of the transaction, VMware will be positioned to provide a highly differentiated, intrinsic security cloud that will better protect enterprise workloads and clients through big data, behavioral analytics and AI.
>
> Carbon Black is a leading next-generation security cloud provider with more than 5,600 customers and 500 partners globally. The company's innovative cloud-native security platform leverages big data and behavioral analytics to provide comprehensive endpoint protection against even the most advanced cyberattacks. The combination of Carbon Black's solutions with VMware's security offerings, including AppDefense, Workspace ONE, NSX and SecureState, will create a modern security cloud platform for any application, running on any

cloud, on any device. This combined offering will provide customers advanced threat detection and in-depth application behavior insight to stop sophisticated attacks and accelerate responses.

The distribution and enterprise reach of VMware and Dell will further accelerate the adoption of Carbon Black in the enterprise, both through direct selling and through partners, including leading managed security players, channel partners and system integrators.

"The security industry is broken and ineffective with too many fragmented solutions and no cohesive platform architecture. By bringing Carbon Black into the VMware family, we are now taking a huge step forward in security and delivering an enterprise-grade platform to administer and protect workloads, applications and networks," said Pat Gelsinger, CEO, VMware. "With this acquisition, VMware will also take a significant leadership position in security for the new age of modern applications delivered from any cloud to any device."

"Today marks an exciting milestone for Carbon Black, VMware and the entire cybersecurity industry," said Patrick Morley, CEO, Carbon Black. "We now have the opportunity to seamlessly integrate Carbon Black's cloud-native endpoint protection platform into all of VMware's control points. This type of bold move is exactly what the IT and security industries have been looking to see for a very long time. We look forward to working with the VMware team to continue delivering a modern security cloud platform to customers around the world. Additionally, we're pleased that today's transaction provides Carbon Black's shareholders with immediate and substantial value."

**DETAILS REGARDING THE TRANSACTION**

Under the terms of the transaction, which is structured as a cash tender offer, Carbon Black shareholders who validly tender (and do not properly withdraw) their shares in Carbon Black, will receive $26 per share in cash, representing an enterprise value of $2.1 billion. The transaction is expected to be funded through cash on the balance sheet, and by accessing short-term borrowing capacity. Closing of the transaction is expected in the second half of VMware's fiscal year 2020, ending January 31, 2020, and is subject to customary conditions, including, VMware's acquisition of at least a majority of the shares of Carbon Black, and the expiration or termination of the required waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, among others.

**Advisors**

J.P. Morgan Securities LLC served as financial advisor and Morrison & Foerster LLP served as legal counsel to VMware. Morgan Stanley & Co. LLC served as exclusive financial advisor and Goodwin Procter LLP served as legal counsel to Carbon Black.

More than 5,600 global customers, including approximately one third of the Fortune 100, trust Carbon Black to protect their organizations from cyberattacks.

The company's partner ecosystem features more than 500 MSSPs, VARs, distributors and technology integrations, as well as many of the world's leading IR firms, who use Carbon Black's technology in more than 500 breach investigations per year.

Carbon Black and CB Predictive Security Cloud are registered trademarks or trademarks of Carbon Black, Inc. in the United States and other jurisdictions.

27.     Rather than continuing to build upon Carbon Black's improving prospects, the Offer Consideration being offered to Carbon Black's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Carbon Black common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

**C.     The Preclusive Deal Protection Devices**

28.     To the detriment of Carbon Black shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

29.     The Merger Agreement contains a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

30.     The no-shop provision also prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to unsolicited proposals regarding alternative acquisitions or business combinations.

31.     Further, the Board must provide VMware with written notice of any Takeover Proposal and must provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with VMware following receipt of

the notice, so that VMware has the opportunity to adjust the terms and conditions of the Merger

Agreement so that the Takeover Proposal ceases to be a Superior Proposal.

32.     In addition, the Merger Agreement provides that the Company will be required to

pay to Parent a termination fee of $70 million to VMware with respect to any termination under

the no-shop provisions.

33.     In fact, even before entering the Merger Agreement, the Exclusivity Agreement

between Carbon Black and VMware required the Company to ignore competing potential

counterparties.

34.     Ultimately, these preclusive deal protection devices restrain the Company's ability

to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a

significant interest in the Company. The aggregate effect of these preclusive deal protection

devices, viewed in light of the materially inadequate consideration offered for Carbon Black

shares in the Proposed Transaction, supports an inference that the Board was not acting in good

faith in approving the terms of the Merger Agreement.

35.     Accordingly, Plaintiffs seeks injunctive and other equitable relief to prevent the

irreparable injury that the Company's shareholders will continue to suffer absent judicial

intervention.

**D.      The Recommendation Statement Omits Certain Material Information**

**(i)      The Recommendation Statement Contains Materially False Statements and Omissions Regarding the Process by Which the Board Agreed to Sell the Company**

36.     On Page 16, the Recommendation Statement states that the Board authorized

Morley to contact "three private equity investment firms that had previously expressed general

interest in getting to know the Company and its business (Party A, Party B, and/or Party C)" on

July 1, 2019 but fails to disclose when, how, and to what extent these companies had "previously expressed general interest."  This information is material to shareholders because the Board reached out to only three potential counterparties and resolved to support the Proposed Transaction less than two months after authorizing Morley to reach out to these companies and barely a month after the senior principals of each of these parties first expressed "a possible interest in pursuing a strategic transaction with the Company."  Especially given the few potential counterparties contacted and the fact that that Carbon Black and VMware entered an exclusivity agreement on August 12, 2019, less than a week after executing confidentiality agreements with Parties A, B, and C to facilitate due diligence, the Company's public shareholders deciding whether to tender their stock pursuant to the Tender Offer need to know the actual extent and timeline pursuant to which Party A, Party B, and/or Party C had previously expressed interest in the Company, why the Company considered them the most viable potential counterparties, and whether Parties A, B, and C had a meaningful opportunity to attempt to compete with VMware.

37.    On Pages 17-18, the Recommendation Statement states that the Special Committee considered Morgan Stanley's "customary relationship disclosures with respect to VMware" at the time it engaged Morgan Stanley but fails to dislcose whether those "customary relationship disclosures with respect to VMware" also included disclosures with respect to the Dell Group ("Dell"), VMware's controlling shareholder, and Pivotal Software, Inc ("Pivotal"), another third-party company that VMware was in the process of acquiring at the time that had also engaged Morgan Stanley in connection with its acquisition.  Morgan Stanley received just $2 million from VMware but approximately $30 million from Dell during the two-year period leading up to its Fairness Opinion and/or also stands to receive millions of dollars from Pivotal,

VMware, and/or Dell upon the consummation of the Pivotal acquisition, which was announced on August 22, 2019, the same day that the Proposed Transaction was announced.  As the Board relied on Morgan Stanley's Fairness Opinion in resolving to support the Proposed Transaction and is touting Morgan Stanley's Fairness Opinion to the Company's public shareholders in the Recommendation Statement, the Company's public shareholders deciding whether to tender their stock pursuant to the Tender Offer would certainly consider that the Board's awareness (or lack of awareness) of these glaring conflicts of interest when it resolved to engage Morgan Stanley as its financial advisors is material.

38.     Page 22 of the Recommendation Statement states that *CTFN* published an article on August 9, 2019 indicating that the Company was "exploring a sale process and had retained Morgan Stanley in connection with the process" (the "CTFN Report") but fails to disclose how or why this information was conveyed to *CTFN* and does not state whether this information was provided on behalf of the Company with the purpose of drawing additional bidders.  Indeed, although Carbon Black received interest from another potential counterparty almost immediately upon publication of the CTFN Report and also received interest from other counterparties within days of the publication of the CTFN Report, the Company and VMware entered exclusivity period on August 12, 2019 before any of those potential counterparties had any opportunity to make a competitive acquisition proposal.

39.     Pages 23-24 of the Recommendation Statement state that, in response to the August 9, 2019 CTFN Report, Party F contacted Morgan Stanley on August 9, 2019 and further state that the Special Committee resolved to enter an exclusivity arrangement with VMware on August 12, 2019 but the Recommendation Statement fails to disclose whether the Special Committee was aware that Party F had expressed interest when they resolved to enter exclusivity

at this time.  Again, as the negotiations with VMware occurred over a handful of weeks and the Company's proactive outreach engaged just a few potential counterparties, whether the Special Committee outright rejected potential counterparties who had expressed interest in the Company immediately following the CTFN Report and if so why the Special Committee did so is certainly material to investors deciding whether to tender their stock pursuant to the Tender Offer. Further, given Morgan Stanley's potential conflicts of interest identified above, the possibility that Morgan Stanley neglected to advise the Special Committee that additional potential counterparties had expressed interest in acquiring the Company before it entered exclusivity with VMware on August 12, 2019, is also material to the Company's public stockholders.  Indeed, by August 15, 2019, the first time the Recommendation Statement states that the Special Committee considered the "unsolicited communications" that were received in the days immediately following the CTFN Report, the Special Committee had already executed the exclusivity arrangement and so the Company's public shareholders cannot rely on the Special Committee's August 15, 2019 conclusion that "none of Party F, Party G or Party H were likely to be in a position to make a credible proposal."

> **(ii)    The Recommendation Statement Contains False Statements and Omissions Related to the Fairness Opinion**

40.    The Recommendation Statement describes Morgan Stanley's Fairness Opinion and the various valuation analyses performed to render its opinion.  However, the description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations, evaluate the opinion that the consideration offered to the Company's shareholders in the Proposed Transaction is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusion, but in

the valuation analyses that support that result.  These key inputs used to arrive at those

conclusions, must also be fairly disclosed.

41.     For example, the Recommendation Statement fails to disclose any of the

assumptions that the Company and Morgan Stanley relied on in developing the cash flow

projections in the Management Forecasts and the Extrapolated Forecasts, which formed the

entire basis for Morgan Stanley's *Discounted Cash Flow Analysis*.  Without this information, it

is impossible to determine whether the cash flow projections actually provide a reasonable

forecast for the Company.

42.     With respect to Morgan Stanley's *Public Trading Comparables Analysis*

beginning on page 32, the Recommendation Statement fails to disclose the actual criteria that

Morgan Stanley relied on in selecting the companies.  The Recommendation Statement includes

a question-begging statement that Morgan Stanley selected these companies because they "share

similar business characteristics and have certain comparable operating characteristics including,

among other things, similarly sized revenue and/or revenue growth rates, market capitalizations,

profitability, scale and/or other similar operating characteristics" but fails to disclose any of the

selected companies' actual revenue, revenue growth rate, market capitalization, profitability,

scale or "operating characteristics."  As a result, it is impossible for the Company's public

shareholders to know whether Morgan Stanley actually based inclusion on objective criteria and

whether Morgan Stanley improperly included certain outlier companies and excluded other

companies that were in fact more comparable to Carbon Black.  Further, the Recommendation

Statement fails to disclose the selected companies Earnings, and further fails to disclose Morgan

Stanley's rationale for valuing the Company based on a Revenue multiple rather than an

Earnings multiple.  Deriving a valuation multiple based on "comparable" companies' revenue is

false and misleading without the disclosure of the selected companies' earnings, which is necessary to determine whether the selected companies' revenue provides an accurate and fair benchmark on which to value Carbon Black.

43.     With respect to Morgan Stanley's *Discounted Equity Value Analysis* beginning on Page 34, the Recommendation Statement fails to disclose the factors Morgan Stanley considered in applying its "professional judgment and experience" to select the AV/Revenue forward multiple ranges and Discount Rate of 9.0%.  As the results of the analysis hinge entirely on the forward valuation and its discounting, the failure to disclose the basis of these inputs makes it impossible for the Company's public shareholders to know whether the assumptions underlying Morgan Stanley's analysis are fair or were derived with the intention of reaching the "right" result.

44.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis* beginning on page 35, the Recommendation Statement fails to disclose the factors Morgan Stanley considered in applying its "professional judgment and experience" to apply (i) a selected range of perpetuity growth rates of 2.0% to 4.0% and (ii) a selected range of discount rates ranging from 8.0% to 10.0%.  The Recommendation Statement further fails to provide a full sensitivity table for the entire range of discount rates and growth rates, which is necessary for shareholders to fairly consider whether the results of the *Discounted Cash Flow Analysis* actually support Morgan Stanley's conclusion that the Proposed Transaction is fair because the Recommendation Statement fails to disclose the basis for the assumptions underlying its selected ranges.

45.     With respect to the *Precedent Transactions Analysis* beginning on Page 35, the Recommendation Statement fails to disclose the criteria Morgan Stanley considered in using its "professional judgment and experience" to determine that the transactions were similar other

than that each transactions implied a minimum aggregate value of $1.0 billion, and further fails

to disclose Morgan Stanley's rationale for deriving the multiples based on revenue rather than

earnings.  As a result, it is impossible for the Company's public shareholders to know whether

Morgan Stanley actually based inclusion on objective criteria and whether Morgan Stanley

improperly included certain outlier transactions and excluded other transactions that were in fact

comparable to the Proposed Transaction.  Further, deriving a valuation multiple based on the

revenue of companies acquired in "comparable" transactions is false and misleading without also

disclosing the earnings of the companies in those transactions because without knowing those

companies' earnings, it is impossible to determine whether the selected companies' revenue

provides an accurate and fair benchmark on which to value Carbon Black.

46.     Regarding Morgan Stanley's *Premiums Paid Analysis* beginning on Page 37, the

Recommendation Statement fails to disclose the actual individual transactions analyzed and the

premium paid in each transaction or even summarize the results of its analysis at all other than

by filtering the results through Morgan Stanley's "professional judgment and experience" to

determine the "proper" premium that should have been paid here.  Without knowing the

premiums paid in other transactions, it is impossible to determine whether Morgan Stanley's

selected 1-Day Premium range of 20% to 50% of the Company's closing share price as of

August 8, 2019 is a fair and accurate conclusion of the results.  Moreover, the Recommendation

Statement further fails to disclose whether and, if so, how Morgan Stanley accounted for the

possibility that part of a precedent transaction premium had already been baked into the

"background" stock price prior to the announcement of a transaction, for example due to a

"jump" in stock price that occurred after a company announced that it was anticipating a merger

before any merger was, in fact, finalized.  *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466,

483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia stock before this date were less than fully confident ones."). Indeed, although Morgan Stanley derives the premium here by comparing it to Carbon Black's *undisturbed* trading price (*i.e.*, the closing price as of August 8, 2019), the Recommendation Statement fails to disclose whether, and if so how, Morgan Stanley attempted to account for the possibility of price disturbances in the precedent transactions.  Without this information, it is impossible to determine whether the selected range is a fair and accurate representation of the results of the analysis.

47.     The Recommendation Statement also fails to clearly and adequately disclose all of Morgan Stanley's potential conflicts of interest.  Pages 39-40 of the Recommendation Statement states that Morgan Stanley is receiving approximately $34 million in connection with this Proposed Transaction and states that Morgan Stanley has received "approximately $30 million" from the Dell Group during the two years prior to the date of its Fairness Opinion but fails to disclose whether or not this "approximately $30 million" amount includes the fees Morgan Stanley has received and stands to receive for the financial advisory services provided in connection with the Pivotal acquisition, which was announced the same day as the Proposed Transaction.  As the Proposed Transaction was negotiated over an extremely abbreviated timeframe and Morgan Stanley was in a unique opportunity to steer the transaction away from other potential counterparties and towards VMware and Dell, whether Morgan Stanley stands to receive substantial sums in connection with the Pivotal acquisition is an important potential conflict that needs to be clearly disclosed to the Company's public shareholders.

## COUNT I
### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

48.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

49.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

50.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

52.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to

obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

53.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

54.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

55.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

<u>**COUNT II**</u>
**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

56.     Plaintiffs incorporates each and every allegation set forth as if fully set forth herein.

57.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

58.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

59.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

60.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

61.     The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the omitted information.

62.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, that render the Recommendation Statement misleadingly incomplete.  Defendants knowingly or with deliberate recklessness omitted the material information identified above from the

Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

63.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of her right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages

C.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: September 13, 2019                    **MONTEVERDE & ASSOCIATES PC**

By:  _/s/ Juan E. Monteverde_
      Juan E. Monteverde (JM-8169)
      The Empire State Building
      350 Fifth Avenue, Suite 4405
      New York, NY 10118
      Tel: (212) 971-1341
      Fax: (212) 202-7880
      Email: jmonteverde@monteverdelaw.com

      *Attorneys for Plaintiff*


**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
      jfruchter@ademilaw.com